UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:22-CR-00096-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S |
| v. | ) | <u>SENTENCING MEMORANDUM</u> |
| | ) | |
| SHAWN EDWARD GOOD | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, respectfully submits this memorandum in connection with the sentencing of Shawn Edward Good, which is scheduled for May 24, 2023, at 10:00am. For the following reasons, the Government believes that a sentence within the applicable Guidelines sentencing range is appropriate.

## THE OFFENSE CONDUCT

The defendant Shawn Edward Good was an investment advisor who executed a decade-long Ponzi scheme through which he solicited and obtained more than $7 million from at least thirteen individuals under false pretenses. Good failed to invest the funds as promised and instead converted the money for his own benefit to support his lavish lifestyle.

Most of Good's victims were existing clients who maintained retirement and investment accounts with Good through his employer Morgan Stanley. Some had known Good for years and considered him a friend. Good offered these victims investment opportunities in real estate projects, tax-free municipal bonds and other purported investments. He urged them to invest by touting the opportunities as low-

1

risk investments that would pay returns of between 6% and 10% over three-month or six-month terms. Given their relationship with Good, they believed him.

To accomplish the scheme, Good instructed victims to wire funds directly Good's personal bank accounts. He caused some victims to obtain a liquid asset line of credit ("LAL") through Morgan Stanley which was secured by the clients' existing investment accounts. Through the LAL, the clients were provided with funds from Morgan Stanley and wired those funds to Good's personal account bank account.

Between 2012 and 2022, Good received a sum of $7,246,302 from at least thirteen victims who believed that Good would invest the funds as promised. But Good's promises were lies. There were no real estate projects or municipal bonds. Instead, Good used the investor funds to make payments to earlier investors and to support his lavish lifestyle, including international vacations, fine dining, vehicles and homes. He used investor funds to purchase a home in Wilmington, NC and a luxury condominium in Lauderdale By The Sea, Florida. He also used victim money to fund extensive personal travel and vacations, including the following destinations:

| DATE | TRAVEL |
|---|---|
| January 2019 | France |
| January 2019 | Italy |
| April 2019 | Spain |
| May 2019 | France |
| November 2021 | Florida (Walt Disney World) |
| November 2021 | New York City, New York |
| December 13, 2021 to December 22, 2021 | France, Netherland, and Italy |
| January 2022 | Colorado |

From September 19, 2017, to August 16, 2019, Good transferred $136,000 in investor funds to a female acquaintance. Between January 25, 2019, and February

22, 2022, Good paid at least $110,000 for various goods or services through Venmo. Memo lines associated with the payments included: "tattoo;" "because your sexy;" "Hotel for Destiny;" "Nailz;" and "shopping." Additionally, Good made the following payments for vehicles with the victims' money:

| Date | Personal Expense | Amount |
|---|---|---|
| February 1, 2017, to May 7, 2018 | 2010 Lexus RX350 | $11,938.21 |
| February 28, 2018, to May 16, 2020 | 1997 Porsche Boxster | $9,856.11 |
| July 21, 2020, to February 22, 2022 | 2019 Tesla Model 3 | $13,960.00 |
| September 19, 2020, to February 22, 2022 | 2018 Alfa Romeo Stelvio | $23,820.00 |

## **VICTIMS**

***Victim W.M.***. is South Carolina resident who retired in 2020 following a career in the food service industry. Beginning in 2008, Good served as W.M.'s financial advisor. W.M. was not an experienced investor and relied on Good to make investment recommendations on his behalf. From 2012 to 2018, Good caused W.M. to invest approximately $795,300 in what Good described as bonds and land development projects. W.M. ultimately became frustrated when none of his Morgan Stanley documents referenced the alleged investments, so he pressured Good to repay his money. Good reimbursed $887,670 to W.M. using funds that were fraudulently obtained from other victims.

***Victim R.T.*** is a resident of Winston-Salem, North Carolina who retired in 2017 from a career as an automotive collision painter. Around 2010, R.T.'s mother introduced him to Good, who was already serving as her financial advisor. R.T., who was not an experienced investor, opened investment accounts with Good. In 2016, Good offered R.T. an investment opportunity for a fractional interest in a real estate

3

development project. Good promised a tax-free 10% return on the investment within three months. Between 2016 and 2019, R.T. invested $1,595,000. R.T. used a LAL obtained through Good to fund a portion of the investment. Good ultimately returned at least $1,470,056 to R.T. using funds fraudulently obtained from other victims. The LAL remained with an outstanding balance of $644,352.66, which accrued interest of approximately $2,000 per month. In total, R.T. paid interest payments totaling $122,562.33.

*Victims M.J.* and *D.J.* are married and live in Las Vegas, Nevada. M.J. is a retired police officer. In December 2018, M.J. and D.J. hired Good to manage the investments for a trust created for the benefit of their three children. In 2019, Good solicited the couple to invest in construction bonds. Good claimed that the investment would be tax-free and yield a 10% rate of return. Between 2019 and 2020, $500,000 was wired from the trust to Good, who converted the funds to personal use. For example, on October 1, 2019, Good received $100,000 from the trust to his personal account. On the same day, Good wired $99,000 to an account in Miami, Florida, to purchase a personal vacation condominium.

*Victim D.B.* owned a small sporting goods store and served as the co-trustee for a Morgan Stanley advisory account owned by a trust benefitting D.B.'s nephew. Good was the account's investment adviser. In March 2018, Good persuaded D.B. to use a Morgan Stanley LAL, secured by the trust, to invest approximately $400,000 in a real-estate project. Good promised $30,000 to $40,000 in profit within about six months. In 2019, Good convinced D.B. to invest an additional $65,000. Good did not

4

invest D.B.'s funds in real estate as promised. Instead, Good used most of funds to make Ponzi payments to earlier investors. In March 2021, Morgan Stanley contacted D.B. to discuss the outstanding LAL and his plans to pay the balance. At the time, neither Morgan Stanley nor D.B. were aware of Good's fraud. After the meeting, D.B. contacted Good to redeem his investment. Over a period of 16 months, Good repaid D.B. $616,000, which D.B. understood to constitute return of his principal investment and profits. All of the funds used to repay D.B. were derived from other victims of the scheme.

**Victim C.A.** is a single mother who invested the money from her divorce settlement to help financially support herself and her two young children, as she had limited income and earning capacity. In February 2020, Good sent an email to C.A. recommending she invest "almost exclusively in municipal bonds," as that would be "a low risk avenue for income for [her] children and [her] long term." Between May 2020 and December 2021, Good convinced C.A. to make 12 bond investments via transfers to Good's bank account, totaling $1,325,000. On one instance, Good received $350,000 from C.A. and transferred $320,000 to R.T., an earlier investor in the Ponzi scheme, on the same day. Good never returned any money to C.A. In February 2022, C.A. recorded phone calls she had with Good, in which Good discouraged her from contacting law enforcement or hiring a lawyer, as doing so would inhibit his ability to redeem her money. Good also encouraged C.A. to send emails to his personal account, as he did not want "any of this going to Morgan Stanley."

**Victim B.A.** (C.A.'s mother), is a retired music teacher living on a fixed income.

5

She asked Good for safe investments for her money because she would need the income in the future to pay for nursing care. Good convinced B.A. to invest in "safe" municipal bonds by transferring money from her Morgan Stanley account to Good's bank account, and Good promised quarterly dividend payments. In October 2019, Good provided her $16,250 as a "dividend" payment. Out of the $950,000 she invested with Good over a two-year period, this was the only reimbursement B.A. received.

*Victim C.H.* lives in Wilmington, NC, and is employed in the healthcare industry. Around 2012, C.H. opened a Morgan Stanley investment account with Good for the purpose of investing lottery winnings. C.H. subsequently opened a LAL secured by his investment account. During a routine quarterly call in April 2018, Good offered C.H. the opportunity to invest in a real estate investment trust. Good advised that C.H. could earn a 6% return over six months. C.H. agreed to invest $150,000 and, on April 8, 2018, drew the funds from his Morgan Stanley LAL. At Good's direction, C.H. then wired the funds to Good's personal bank account. Over a period of two weeks, Good used $39,340 in funds directly traceable to C.H. to make Ponzi payments to other victims. An additional $37,200 was used to pay down credit card balances and $50,000 was wired to a female acquaintance. None of C.H.'s investment was returned.

*Victim S.S.*, of Myrtle Beach, SC, is a retired educator and client of Good since 2009. Around 2015, Good solicited S.S. and her husband to invest in a real estate investment trust. At the time, S.S's husband was sick and died several months later. S.S. followed Good's recommendation and, from April 2015 to November 2018, made

6

a series of $25,000 investments totaling $325,000. All payments were made by personal check hand-delivered to Good. S.S. received no documentation from Good related to the investment. The investigation established that Good converted all of S.S.'s investments to personal use. None of the invested funds were returned to S.S.

*Victim C.P.* is a resident of Conway, SC and retiree from a career in health counseling. C.P. began using Good as an investment advisor around 2008. Around 2012, Good presented C.P. with an opportunity to invest in a real estate investment trust (REIT). Good promised a rate of return of 6%-7% per six-month period. C.P. followed Good's recommendation and invested a sum of $211,002 over several payments from August 2012 to March 2019. In 2019, Good paid C.P. $283,255, which Good represented as C.P.'s principal investment plus interest. In truth, Good repaid C.P. using funds obtained from another Ponzi victim.

*Victim R.U.* is retired from Sears and resides Escondido, CA. Good solicited R.U. to invest in a land development project related to building streets and gutters. According to Good, the investment would pay tax-free interest on a quarterly basis. R.U. followed Good's recommendation and, from December 2018 to October 2021, made fourteen investment payments totaling $385,000. During the same period, Good periodically made "interest" payments to R.U. totaling $133,700, resulting in a net loss to R.U. of approximately $251,300.

*Victim J.F.* invested $500,000 with Good by wire transfer to Good's personal bank account. The following day, Good transferred $487,000 to Ponzi victim W.M., who had previously invested $795,300. From July 2019 to August 2019, Good

7

returned $519,600 to J.F.. On April 21, 2021, Good paid J.F. an additional $550. Nearly all of the funds returned to J.F. were derived from other victims of Good's scheme, including $500,000 that Good obtained from victim B.A.

***Victim F.D.*** is a resident of Conway, South Carolina and was Good's financial services client for approximately sixteen years. Good offered F.D. an opportunity to invest in real estate. F.D. agreed and invested $20,000. There was no paperwork involved. Good made six return payments to F.D. totaling $54,071.25, all of which derived from funds Good fraudulently obtained from other investors.

### 3553(a) FACTORS

The government submits that a sentence within the applicable Guidelines range is sufficient but not greater than necessary to comply with the purposes enumerated in the Sentencing Reform Act.

**1       The Nature, Circumstances, and Seriousness of the Offense**

Good's crime was unquestionably serious. He orchestrated a long-running Ponzi scheme during which he repeatedly abused his position of trust as an investment advisor to steal from his clients, who were primarily working-class people and included a retired teacher, a retired police officer and a single mother. The victims he betrayed were ordinary people who had little or no investment experience and entrusted Good to act in their best interests.

Good's fraud was not a singular breach of trust or momentary lapse in judgment. Rather, it was a multi-year scheme wherein Good repeatedly doubled-down on his lies to steal more of his victims' money. Good had ample opportunity to

reflect on the wrongfulness of his conduct and to end the scheme. Instead, he chose to continue to enrich himself at the expense of his victims.

Good did not defraud his victims out of selfless concerns or imminent needs. Instead, Good was gainfully employed as salaried investment advisor. His primary motivation was personal gain to support a lavish lifestyle.

Moreover, the financial losses represent only a part of the harm that Good's scheme caused his victims. As illustrated by the following passage from a victim impact statement, Good's crimes caused profound stress and emotional injury:

> His actions have forever altered my life in many ways. The loss of funds certainly eroded my sense of being able to live comfortably the rest of my life. As an 80 plus widow with multiple medical issues, fear is always present that I won't have enough funds to cover my needs.
>
> Mentally, a sense of shame and self-blame became my daily mindset. I withdrew from everyone and all activities. Sadness marked my days …sad I had let this happen and personal shame that someone I trusted infinitely had knowingly and willingly done this to me over the span of several years.

The nature and circumstances of this offense support a significant sentence of imprisonment.

2. **The History and Characteristics of the Defendant**

The Government recognizes that Good has no prior criminal record and, to his credit, has accepted responsibility for the offense conduct. For this, he deserves some measure of credit. However, these factors are incorporated into the Guidelines calculation and, in any event, are outweighed by the aggravating factors.

Good came from a solid educational background which included a high school

degree, several years of college and several professional licenses in the financial industry. While executing this scheme, he was a gainfully employed financial advisor who, from 2016 to 2021, earned an annual salary ranging $66,000 to $124,000.

These circumstances demonstrate that the Good was motivated by greed and the desire to support his lavish lifestyle.

3. **The Need for the Sentence Imposed to Promote Respect for the Law, to Provide Just Punishment; to Afford Adequate Deterrence; and to Protect the Public from Further Crimes of the Defendant**

A Guidelines sentence is necessary to promote respect for the law, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide just punishment for the offense. General deterrence is particularly important with respect to Ponzi schemes like Good's, which by their nature are difficult to investigate and may go years without detection. In Good's case, the fraud spanned 10 years and resulted in losses to victims exceeding $3 million. A significant sentence of incarceration will send a clear message of deterrence to financial advisors, and to others who occupy positions of trust, that there are severe consequences for abuse of that trust.

## **CONCLUSION**

The circumstances specific to this case – in particular, the duration of the scheme, the manner and means used to execute the scheme repeatedly, and the harm to victims – all suggest that a sentence within the Guidelines range is appropriate.

Respectfully submitted, this 19th day of May 2023.

                                      MICHAEL F. EASLEY, JR.
                                      United States Attorney

BY:   /s/ Toby Lathan
        TOBY LATHAN
        Assistant United States Attorney
        150 Fayetteville Street, Suite 2100
        Raleigh, NC 27601
        Telephone: 919-856-4530
        Email: toby.lathan@usdoj.gov
        N.C. Bar No. 35398

CERTIFICATE OF SERVICE

       This is to certify that I have this 19th day of May, 2023, served a copy of the foregoing Government's Sentencing Memorandum upon counsel for the defendant in this action via the CME/ECF system to:

Joseph E. Zeszotarski , Jr.
Gammon, Howard & Zeszotarski, PLLC
115 1/2 West Morgan St.
Raleigh, NC 27601
919-521-5878
Fax: 919-882-1898
Email: jzeszotarski@ghz-law.com

                          /s/ Toby Lathan
                          TOBY LATHAN
                          Assistant United States Attorney
                          Criminal Division